**Chesley H. WHITE, Jr., individually and on behalf of all other employees similarly situated, Plaintiffs,**

v.

**OSMOSE, INC., Defendants.**

Civ. A. No. 01–A–877–N.

United States District Court,
M.D. Alabama,
Northern Division.

May 13, 2002.

David R. Arendall, Stephanie S. Woodward, Birmingham, AL, for Plaintiffs.

Charles B. Paterson, Montgomery, AL, Teresa G. Minor, Birmingham, AL, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on Plaintiff's Motion for Conditional Class Certification and Authorization to Send Notice to Potential Opt-in Plaintiffs (Doc. # 27), Plaintiff's Renewed Motion to Compel (Doc. # 34), Plaintiff's Motion for a New Scheduling Order (Doc. # 51), Defendant's Motion for Protective Order and Opposition to Plaintiff's Renewed Motion to Compel (Doc. # 35), and Defendant's Motion to Correct Its Motion to Strike and the Court's Order of January 16, 2002 (Doc. # 48). The Complaint in this case (Doc. # 1) was filed by Plaintiff on July 16, 2001, alleging claims under the Fair Labor Stan-

dards Act, 29 U.S.C. § 201, *et seq.*, the Consolidated Omnibus Benefit Relief Act ("COBRA"), 29 U.S.C. § 1161, *et seq.*, and for intentional infliction of emotional distress and conversion. On November 15, 2001, Plaintiff moved to voluntarily dismiss his COBRA and state law claims without prejudice (Doc. # 25), and the court granted the motion on November 19, 2001.

For reasons to be discussed, the court determines that Plaintiff's Motion for Conditional Class Certification and Authorization to Send Notice to Potential Opt-in Plaintiffs is due to be GRANTED in part and DENIED in part; Plaintiff's Renewed Motion to Compel is due to be GRANTED in part and DENIED in part; Plaintiff's Motion for a New Scheduling Order is due to be GRANTED; Defendant's Motion for Protective Order is due to be DENIED; and Defendant's Motion to Correct is due to be DENIED as moot.

## II. FACTUAL BACKGROUND

Defendant Osmose, Inc. ("Osmose") is a company that, among other things, provides various maintenance services to utility companies. Osmose contracts to inspect and treat wooden utility poles and to provide general upkeep services such as paring back the vegetation around different transmission facilities. Plaintiff Chesley White ("White") worked as an hourly paid foreman for Osmose between October 2, 2000 and May 1, 2001. Foremen working in White's former division are primarily responsible for supervising small crews of between 2 to 6 members who perform inspections and treatments on utility poles. White was paid on a weekly basis at a base rate of $11.00 an hour, with bonuses added to that rate depending on whether certain quotas were reached.

As part of his duties, White was required to drive a company truck to job sites. Apparently with some regularity, job sites were distantly located from White's and crewmen's homes. Often this meant that White and his crewmen had to stay in motels during the work week. White alleges that he was not compensated for much of the travel incident to his job. White also alleges that he was often required to transport crewmen to and from their homes on the weekends, without compensation. Further, White alleges that he was told not to turn in time for cleaning and maintaining the company truck, which comprised an "integral and indispensable" portion of his duties.

In addition to his duties with respect to the company truck and the "in the field" work, White alleges that he was required to perform administrative duties largely "off the clock." These duties included submitting his crew's payroll information and planning and keeping track of the field work with a handheld computer and various maps. White says that these duties often required several hours each week, and often had to be completed at night, "after hours." White also alleges that he was required to attend numerous supervisory meetings for which he was not paid, and that he had to interview prospective crewmen, also without compensation.

White contends that being required to perform these various duties without being properly compensated constitutes a policy violative of the FLSA. Furthermore, White alleges that his experiences are common, and that potentially there is a large number of foremen and crewmen with substantially similar grievances. Osmose counters that White has not demonstrated that such experiences are common and, in any event, such employment practices are at odds with Osmose's policies as articulated in their Foreman's Manual.

## III. DISCUSSION

White moves the court to certify a conditional class of current and former Osmose

employees who are allegedly similarly situated with respect to job duties and pay provisions, and to authorize notice to these individuals of their "opt-in" rights. White contends that this class should be composed of all foremen and crewmen employed by Osmose in its utilities division within the three years preceding the filing of this lawsuit. In support of this motion, White has submitted a considerable amount of deposition testimony, affidavits, and other materials. He contends that this evidence supports the inference that a number of similarly situated, aggrieved individuals potentially exist nationwide. Osmose contends that White has failed to make such a showing, and that the court should decline to certify such a broad class.

### A. Section 216(b) and the "Similarly Situated" Requirement

■ Section 216(b) of the FLSA provides, in pertinent part:

> Any employer who violates [the minimum wage or maximum hours provisions of this title] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). District courts have discretionary power to authorize the send-

ing of notice to potential class members in a collective action brought pursuant to § 216(b). *See Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) [1]; *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir.2001) ("The decision to create an opt-in class under § 216(b), like the decision to certify a class under Rule 23, remains soundly within the discretion of the district court"). The power to authorize notice must, however, be exercised with discretion and only in appropriate cases. *See Haynes v. Singer Co.*, 696 F.2d 884, 886 (11th Cir.1983).

■ In the absence of statutory or regulatory guidance as to when or how this discretion to authorize notice to "similarly situated" employees is to be exercised, the Eleventh Circuit held that a district court should make certain determinations before allowing an individual plaintiff to give notice to other potential members of a plaintiff class under the FLSA. Specifically, "the district court should satisfy itself that there are other employees of the defendant-employer who desire to 'opt-in' and are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Dybach v. Florida Dept. of Corrections*, 942 F.2d 1562, 1567–68 (11th Cir.1991). The plaintiff has the burden of demonstrating a reasonable basis for crediting his assertion that aggrieved individuals exist in the broad class he proposes. *See Haynes*, 696 F.2d at 887.

■ At this point in the proceedings, the court must determine whether White has made the requisite initial showing to warrant conditional certification of a class and court-authorized notice to class members. Incident to this determination, the court must also decide if Osmose should be

---

**1.** *Hoffmann–La Roche* involved an ADEA collective action, brought as a § 216(b) action

pursuant to the ADEA's express statutory adoption of § 216(b) of the FLSA.

compelled to disclose the names and addresses of all the members of the proposed class. The first and dispositive question is whether White and the potential opt-in plaintiffs are similarly situated. *See Dybach*, 942 F.2d at 1567. A plaintiff bears the burden of establishing that he and the class he wishes to represent are similarly situated. *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996). Ordinarily, this burden is not heavy and may be met by detailed allegations supported by affidavits.[2] *Id.* at 1097.

A number of courts have struggled with the meaning and application of the "similarly situated" requirement of § 216(b). *See, e.g., Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir.1995) (comparing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987) (utilizing an ad hoc approach), with *Shushan v. Univ. of Colorado*, 132 F.R.D. 263 (D.Colo.1990) (employing the F.R.C.P. 23 standard)). The Eleventh Circuit has expressed the view that the "similarly situated" requirement is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance) ... [and] that a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b) ...." *Grayson*, 79 F.3d at 1095.[3] Noting that § 216(b)

reflects a policy in favor of judicial economy, the Supreme Court opined that "the judicial system benefits by efficient resolution in one proceeding of common issues of law and fact *arising from the same alleged discriminatory activity.*" *Hoffmann–La Roche*, 493 U.S. at 170, 110 S.Ct. 482 (emphasis added). In *Hoffmann–La Roche*, the defendant had ordered a reduction in work force and had discharged or demoted some 1200 employees. A group of former employees obtained consents to opt-in from 600 people who felt they were discriminated against by the defendant's cutbacks. *See id.* at 168, 110 S.Ct. 482; *see also Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 261 (S.D.N.Y.1997) (holding that plaintiffs met the similarly situated requirement by pointing to an express, company-wide employment policy allegedly in violation of the FLSA).

■ Other courts have determined that members of a proposed class were not similarly situated where the supposedly unlawful activities of the employer were not shown to be pursuant to a common scheme, plan, or policy. *See, e.g., Brooks v. BellSouth Telecommunications, Inc.*, 164 F.R.D. 561, 569 (N.D.Ala.1995) ("it is clear that any claims of the proposed opt-in plaintiffs would present disparate factual and employment settings"); *Tucker v.*

---

**2.** As the *Mooney* court explained, "[b]ecause the court has minimal evidence [the notice] determination is made using a fairly lenient standard and typically results in 'conditional certification' of a representative class." 54 F.3d at 1214. Similar to the situation in *Brooks v. BellSouth Telecommunications, Inc.*, however, White has had extensive discovery with respect to Osmose's policies regarding the pay provisions of employees in the utilities division. *See* 164 F.R.D. 561, 566 (N.D.Ala. 1995). Accordingly, the court deems it necessary to carefully consider the submissions of the parties with respect to the class allegations, rather than merely relying on the handful of affidavits that support White's position.

**3.** In that case, however, the court was "persuaded that the allegations, affidavits, and depositions [met] a standard of greater stringency than the 'similarly situated' standard found in § 216(b)." *Grayson*, 79 F.3d at 1096. There was a considerable amount of evidence supporting the inference that the defendant had instituted a discriminatory plan to rid itself of older managers. *See id.* at 1097–99. Indeed, later in the opinion the court stated that the plaintiffs needed to make "substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits 'which successfully engage defendants' affidavits to the contrary.'" *Id.* at 1097.

*Labor Leasing, Inc.*, 872 F.Supp. 941, 947–49 (M.D.Fla.1994) (same). The aforementioned dicta in *Grayson* notwithstanding, this court concludes that a plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions. Without such a requirement, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse. *See id.*

### B. Foremen vs. Foremen and Crewmen

■ White contends that the conditional class should include both foremen and crewmen employed during the relevant period, because their pay provisions are both subject to the allegedly unlawful policies of the defendant. Osmose argues that White should not be allowed to represent crewmen because their respective job duties are markedly dissimilar and there is an inherent conflict of interest between them. The court finds Osmose's position persuasive.

Foremen are the direct supervisors of crewmen. In addition to supervising and directing the work of the crews, foremen have a number of administrative duties associated with the planning and execution of the field work, the payroll for themselves and their crews, and the cleaning and maintenance of the tools and company vehicles. *See* Pl. Exh. 10 at 15. The evidence also shows that foremen are responsible for maintaining the proper number of crew members, and often assume personal responsibility for a crewman's attendance. *See id.* ("[m]aintain a full crew and work full weeks"); White Depo. at 145. It is abundantly clear to the court that foremen and crewmen are not similarly situated with respect to their job duties.

As noted, foremen are responsible for keeping track of and accurately reporting their crew members' payroll information. White alleges that he was told by his supervisors on at least one occasion to report fewer hours for his crew than were actually worked, in order to "get their numbers up."[4] White Depo. at 273–74. By encouraging him to report fewer hours for himself and his crew, White contends, the company is responsible for violations of the FLSA with respect to both foremen and crewmen. Osmose counters that since foremen are responsible for reporting the hours worked by their crew, foremen are potentially complicit in the allegedly unlawful practice of failing to report overtime. Furthermore, foremen allegedly have an economic incentive to under-report the hours of their crew if the crew's production falls below "norm,"[5] as they receive bonuses for being more efficient. The court is persuaded that since foremen may be held individually responsible for the potential claims of crewmen, there is an inherent conflict of interest between the two groups. *See, e.g., Herman v. RSR*

---

4. Osmose has an incentive bonus system whereby foremen and crew receive higher per hour pay if they produce a certain number of units per man hour. Depending on the type of work, units could be utility poles or other convenient measurements of a particular crew's production. Basically, it is a system that rewards more efficient foremen and crews.

5. The Plaintiff's position is somewhat confused on this issue. White testified that "[i]t is not to [a foreman's] advantage to underreport hours." White Dep. at 279. White contends, however, that the bonus plan does create such an incentive for his superiors. While this position is not necessarily inconsistent, the evidence does not demonstrate that foremen would never have an incentive to under-report the hours worked by the *crew*. In any event, White admits that on occasion he "shorted" his crew on hours worked. *Id.* at 275.

*Sec. Servs.,* 172 F.3d 132 (2d Cir.1999) (holding that individuals may be liable under the FLSA where, pursuant to the "economic reality" test, they may be deemed "employers" under 29 U.S.C. § 203(d)).

■■■ By negative implication, the Eleventh Circuit has made clear that the strict requirements of F.R.C.P. 23 are inapplicable to an opt-in collective action under the FLSA. *See Grayson,* 79 F.3d at 1095; *see also LaChapelle v. Owens–Illinois, Inc.,* 513 F.2d 286, 288 (5th Cir.1975) (discussing fundamental differences between § 216(b) and Rule 23 actions). Accordingly, the requirement that the representative plaintiff's counsel "adequately represent" the class is not present to the same degree. This does not mean, however, that adequacy of the plaintiff's counsel is irrelevant. FLSA collective actions are representative actions and, "given that individuals who 'opt-in' to this proceeding will most likely be represented by the named-plaintiff's counsel, the [c]ourt has an equitable interest in ensuring that they are adequately represented." *Hoffmann,* 982 F.Supp. at 263. Because the court finds that the job duties of foremen and crewmen are dissimilar, and that there is inherent conflict between the two groups, the court concludes that crewmen should be excluded from a conditionally certified class. *See Tucker,* 872 F.Supp. at 947–49; *Hoffmann,* 982 F.Supp. at 263.

### C. Evidence as to the Propriety and Scope of a Conditional Class

■■ White has submitted a considerable amount of evidence which, he contends, demonstrates that similarly situated, aggrieved individuals are likely to exist nationwide.[6] The evidence may be summarized as follows: (1) the deposition testimony of White, (2) the deposition testimony of several Osmose employees who had direct and indirect supervisory authority over White during his term of employment, (3) affidavits and "opt-in consents" of three foremen who worked for Osmose in Alabama and have similar grievances to those of White, (4) deposition testimony and the complaint from a case in California that, White argues, is evidence of practices similar to those complained of in this case, and (5) the Foreman's Manual, which White argues contains policies and directives that result in violations of the FLSA. Osmose has submitted the payroll records of the Plaintiff and several of the affiants to rebut their assertions that they were not properly compensated for overtime and "non-productive"[7] hours.

White claims that he worked more than forty hours in "virtually every work week" during his tenure as a foreman. Pl. Brief at 5. With respect to his administrative duties, he says that Scott Young ("Young"), district manager and direct supervisor of White, told him "we never pay that," and that he would be fired if he turned in his time spent performing those tasks. White Dep. at 129–30. Young also allegedly told White that he was not to turn in time for cleaning the company vehicle, re-stocking the vehicle with supplies, or maintaining the tools. *Id.* at 114. White says that Young told him "company policy was [Osmose] would only pay from the time the shovel hit the dirt until the last hole is dug." *Id.* As noted, White also

---

**6.** Because the court has determined that crewmen should be excluded from a conditional class of similarly situated employees, only the evidence pertaining to foremen will be considered henceforth.

**7.** Osmose requires that foremen submit payroll information in different categories, depending on the type of work that was performed. "Non-productive" hours are those spent on duties that do not directly relate to work in the field, such as company vehicle maintenance.

claims that on one occasion he was instructed by Young and another supervisor, Coy Lambert, to under-report his crew's hours in order "to get their numbers up." Id. at 273–74. With regard to interviewing prospective crew members, White alleges that Randy Marquardt, the Osmose manager responsible for the area comprised of the state of Alabama, told him not to submit time for such activities. *See id.* at 108–10.

At one point in his testimony, White claimed that he did not under-report his or his crew's hours. *See id.* at 274–75. Backing up, he then admitted that he may have "rounded down," in order to comply with his supervisors' instructions. *Id.* White also admits he understood that Young's and his other supervisor's alleged directions were at odds with Osmose's policies as articulated in the Foreman's Manual. *See id.* at 275–76.

A portion of Young's testimony is consistent with White's allegations regarding the instructions he was given by Young. Young testified that the extra administrative duties of a foreman averaged just under forty minutes per day. *See* Young Depo. at 49. When asked whether a foreman's time records should show an average of forty minutes per day more than a crew member's, Young replied "[n]o, sir." *Id.* at 51. His explanation was that "[a] foreman gets a higher incentive rate for the extra responsibilities," lending credence to White's claim that he was instructed not to turn in time for work done "after hours." *Id.* at 51–53. After a short break was taken in the deposition, Young claimed that he did not fully understand the earlier questions, and that company policy was that foremen should be paid for all hours worked. *See id.* at 54–57. Given that his prior answers were clear and un-

equivocal, it is difficult for the court to credit Young's assertion that he was confused about the earlier questions.

The depositions of Coy Lambert and Jay Groves, supervisors who had dealt with White on a few occasions, do not support the premise that Osmose does not pay foremen for their time spent on "extra duties." Both Lambert and Groves testified that the administrative duties described by White were to be reported as "productive" time. *See* Lambert Depo. at 38–39; Groves Depo. at 18. The testimony of Kip Hughes, head of Osmose's utilities division, also supports this position, an interpretation of company policy at odds with Young's apparent understanding. *See* Hughes Depo. at 94–98. In short, the testimony of company employees other than Young does not indicate or suggest that the directions and interpretations allegedly given to White are consistent with the company's national employment policies and practices.

White claims that the affidavits submitted by Terry Mason, Jason Simon, and Greg Vogt "show that other foremen were required to perform the same duties and functions without pay as an integral and indispensable job function." Pl. Brief at 6. Each of these affidavits do indeed express grievances substantially similar to those of White. *See* Pl. Exhs. 4, 5, 6. Furthermore, Mason asserts that at a statewide safety meeting, foremen were instructed by Randy Marquardt, Jay Groves, and Coy Lambert that "[t]he clock doesn't start until the first shovel hits the dirt." Pl. Exh. 4 at ¶ 12. Without more context, however, it is difficult for the court to ascertain whether this alleged statement carries the significance White ascribes to it. In any event, these affidavits do support White's position that there are other foremen in Alabama [8]

---

8. Terry Mason claims that the complained of practices also existed in other states during

the "mid–1990's." Pl. Exh. 4 at ¶ 21. Because this vague allegation pertains to a peri-

who feel they have been aggrieved in ways similar to those of which White complains.

To add further support to his argument that the alleged FLSA violations by Osmose are widespread, White has submitted a copy of a complaint and excerpts of deposition testimony from a case in California. *See* Pl. Exh. 2; Pl. Supp. Exh. 4–7. In the complaint, the California plaintiffs allege that Osmose "adopted and implemented a practice whereby hourly wage employees such as plaintiffs regularly worked hours for which they were not compensated." Pl. Exh. 2 at ¶ 16. The complaint outlines grievances similar to those of White, such as being required to maintain company vehicles and to complete administrative paperwork "off the clock." *Id.* White has also submitted deposition testimony from some of the plaintiffs in that case. The court, however, views these submissions with a great deal of scepticism because the plaintiffs later elected to drop their claims for overtime compensation. *See* Pl. Exh. 3. While this decision may have been strategic, it is not for this court to speculate as to the California plaintiffs' rationale. Furthermore, it is unlikely that these plaintiffs desire to opt-in to this case, as their interests are presumably being protected in the California litigation.

Finally, White points to Osmose's Foreman's Manual as evidence that Osmose encourages employment practices that result in FLSA violations. Specifically, White notes that the Manual suggests foremen should discuss work plans and safety issues with crewmen prior to beginning work at the job site. Furthermore, White notes, the manual urges foremen to choose a route from the job site that allows the foremen and crew to view the work for the next day and to anticipate any issues or complications that may arise. These policies, White argues, result in the foremen's and crews' participation in work activities beyond the "field work" for which they are actually paid. In other words, White essentially argues that the Foreman's Manual encourages foremen to work their crews "off the clock." The court notes, however, that this contention is tempered by the fact that crewmen are not required to ride in the company vehicle, nor are foremen required to conduct meetings while driving to and from the work site. The evidence suggests that the more common practice is to conduct "tailgate" meetings, where work issues are addressed after arrival at the job site. *See, e.g.,* Hughes Depo. at 65. In any event, the Foreman's Manual does not compel the inference that Osmose's stated policies inevitably lead to FLSA violations on a nationwide basis.

To counter the evidence submitted by White, Osmose has submitted the payroll records of White and the other potential opt-in plaintiffs in this case to demonstrate that Osmose did in fact pay these employees for overtime and miscellaneous nonproductive time, contrary to their allegations. See Def. Exh. to Supp. Brief A, B. While inconclusive as to White's specific claims, these records indicate the likely presence of myriad individual issues at-

---

od of time beyond the scope of this suit, the court does not consider this assertion to be relevant to the matter at hand. Mason, Simon, and Vogt all worked primarily in Alabama during the relevant period, under the indirect supervision of Marquardt. See Pl. Exh. 4, 5, 6.

White also points to the fact that Scott Young has worked in states other than Ala-

bama. This, however, does not support White's claim that aggrieved individuals exist nationwide. White has been given the names and addresses of all employees who worked under Young during the relevant period, and has produced only these three affidavits from foremen who worked in Alabama.

tendant to the potential opt-in plaintiffs' claims. Because Osmose did in fact pay *some* overtime, it is likely that any particular claim will require specific, individualized proof as to any hours that Osmose refused to pay. Whether individualized proof will be required as to Osmose's *liability* for each employee's claim, as opposed to *damages,* is an open question properly addressed at a later stage in the proceedings, such as on a motion for decertification.

### IV. CONCLUSION

Having considered the evidentiary submissions of the parties in their entirety, the court is not satisfied that conditionally certifying a nationwide class will partake of the economy of scale envisioned by the FLSA collective action procedure. *See Hoffmann–La Roche,* 493 U.S. at 170, 110 S.Ct. 482. Furthermore, as the *Brooks* court noted, " 'courts, as well as practicing attorneys, have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation.' " 164 F.R.D. at 567 (quoting *Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 266 (D.Minn. 1991)).

This is not to say that a collective action is completely unwarranted in this case. Without expressing an opinion as to the merits, the court finds that White has made substantial allegations regarding certain directives by Young, Lambert, and Marquardt that may have led to FLSA violations. Accordingly, the court is satisfied that there are similarly situated foremen who worked in Alabama under these individuals who may desire to opt-in to this litigation. Thus, White's Motion for Conditional Class Certification and Authoriza-

tion to Send Notice to Potential Opt-in Plaintiffs is due to be GRANTED in part and DENIED in part. The court finds it appropriate to conditionally certify a class comprised of foremen who worked in Alabama, the area supervised by Marquardt, during any of the three years prior to the filing of this lawsuit.[9] White will be given the opportunity to discover and contact these individuals via court authorized notice to apprize them of this action.

A separate Order will be entered consistent with this Memorandum Opinion.

---

**9.** Osmose argues that because White has not shown that the alleged violations were willful, the temporal scope of the conditional class should be limited to the two years preceding the filing of this suit pursuant to 29 U.S.C. § 255(a). The court finds that this argument is better taken up on a motion for decertification of the class or a motion for summary judgment, as there is not enough evidence before the court to make this determination.